41 So.2d 185

**CAMPBELL v. CAMPBELL.**

**4 Div. 488.**

Supreme Court of Alabama.

March 24, 1949.

Rehearing Denied June 30, 1949.

Powell, Albritton & Albritton, of Andalusia, for appellant.

488

C. L. Rowe, of Elba, for appellee.

LIVINGSTON, Justice.

This suit was instituted by appellee, the wife, seeking a divorce from the husband on the ground of cruelty. Upon the filing of the bill, the trial court directed the register to hold a reference and report to the court: (a) whether or not, prima facie, the complainant had reasonable grounds for divorce; (b) the earnings, the condition and value of complainant's estate; (c) the earnings, condition and value of the estate of the respondent; (d) what would be a reasonable sum, in view of the earnings, the condition and value of the husband's estate, to be allowed as solicitor's fees for the prosecution of the suit, and other reasonable expenses thereof; and (e) what would be a reasonable sum for alimony pendente lite for the support of complainant and infant daughter. The reference was duly held and, pending the report of the register, complainant amended her bill by praying, in the alternative, that she be decreed separate maintenance and support, custody of the infant child of the parties, and that she be allowed suit money and solicitor's fees for the prosecution of this aspect of her suit. Respondent answered the bill as amended, incorporating therein a demurrer. The parties then agreed to submit the cause for final decree on the bill of complaint, demurrer and answer thereto, and the testimony taken before the register on the reference.

The register found and reported to the court that: (a) complainant has, prima facie, reasonable grounds for a divorce; (b) complainant has no estate, and is not employed, and is living with her parents; (c) the estate of the respondent is of comparatively small value, consisting in the main of an automobile, farming equipment, two small bank accounts, one a partnership account, and that the respondent is engaged in the business of buying and selling cattle, and that his earning capacity is fairly substantial; (d) that a reasonable solicitor's fee for prosecuting the suit is $350.00; that complainant is entitled to $100.00 suit money, or expenses in prosecuting the suit; (e) that complainant is entitled to $65.00 per month for the support of herself and minor child.

Both complainant and respondent filed exceptions to the report of the register.

The trial court entered a decree overruling respondent's exceptions to the register's report, sustaining complainant's exceptions in part, allowing complainant $600.00 solicitor's fees, $100.00 suit money, granting the divorce on the ground of cruelty, and awarding complainant $100.00 per month for the support of complainant and her minor child. From this decree, respondent appealed.

In the first place, there is hardly a more difficult assignment than separating the wheat from the chaff in cases of this character, where the witnesses are not seen nor heard and their testimony is in direct and hopeless conflict. For this reason, it has long been the settled rule of this jurisdiction that the report of the register on evidence given ore tenus before him, is accorded the weight of a verdict of a jury, and will not be disturbed unless the court is convinced that the finding is palpably and plainly wrong. 2 Ala.Dig., Appeal and Error, ☞1017. And where the trial court re-examines all the testimony and sustains

the exceptions, on appeal from such decree, the burden is on appellant to show error and injury. He is aided in this task by the usual presumption of correctness attending the register's report on the hearing before the trial court, as to finding of facts on testimony given ore tenus before him. Bidwell v. Johnson et al., 195 Ala. 547, 70 So. 685; O'Rear v. O'Rear, 227 Ala. 403, 150 So. 502. In other words, the rule applies to the review of the register's findings, both by the trial court and on appeal from his decision by the Supreme Court. Bidwell v. Johnson et al., supra.

■ As we have said, the inferences to be drawn from the testimony are hopelessly conflicting. The register had the witnesses before him. He heard them testify and observed their demeanor on the stand, and, as a consequence, was in a much better position than either this Court or the trial court to correctly determine the true facts in the case. The rule stated above is, we think, particularly applicable to the evidence now under review, and to which we have given our most careful consideration. We hold therefore that the trial court was in error in sustaining the complainant's exceptions to the register's report. The exceptions of both complainant and respondent should have been overruled, and the register's report affirmed.

In pertinent part, section 22, Title 34, Code of 1940, provides for a divorce "In favor of the wife when the husband has committed actual violence on her person, attended with danger to life or health, or when from his conduct there is reasonable apprehension of such violence."

Aside from the charges of other reprehensible conduct on the part of respondent, clearly not amounting to cruelty under the statute and decisions of this Court, the quo modo of the cruelty charged is in the following language:

"That he told oratrix in to-wit, the summer of 1946, that he was going to sell his farm to one Nash for to-wit, fourteen thousand five hundred and no/100 (14,500.-00) dollars, and put the money in the name of his minor child by a former marriage. Oratrix advised respondent that she would refuse to sign the deed of conveyance and sought the advice of attorneys as to her rights in the premises. In to-wit, November 1946, respondent told oratrix that he had had the deed prepared for her signature and he got oratrix in his car to take her to the appointed place for consummating the sale of the farm lands. When oratrix protested against signing the deeds he threatened to drive the car, in which they were driving off the river bridge into the waters below and told her that he could escape but that, in her pregnant condition, she could not. That said conduct was a threat to her life on the part of the respondent. And she has reasonable apprehension of death or serious body harm to her if she further cohabits with respondent. Under such threats and coercion being practiced upon her, she then being about six months pregnant, oratrix accompanied respondent to the appointed place and signed said deed against her will but believing that the safety of herself and her unborn child required that she so sign it."

■ As for the charge of cruelty, the bill sufficiently informed appellant of the nature and character of the offense which appellee expected to prove. Time, place and the act of violence complained of are so alleged as to inform appellant of the case he might prepare to meet. Smedley v. Smedley, 30 Ala. 714; Brown v. Brown, 219 Ala. 104, 121 So. 386. The demurrer to the bill was properly overruled. As proof of the allegation of cruelty, complainant testified:

Q. "Mrs. Campbell, do you recall an occasion when you were in your husband's automobile going to a place at which you had been advised as the appointed place for conveyances of certain land to Mr. Augustus Nash? Do you recall that occasion? A. Yes, sir.

Q. "Did he make any threat to your life or did he make any threat to do you bodily harm? A. Yes, sir.

Q. "Tell the court what that was. A. He attempted to drive me off in the river when I refused to sign the deeds selling the place.

Q. "Were you in the automobile with him at that time? A. Yes, sir.

Q. "Was he driving? A. Yes, sir.

Q. "And where were you going? That is, what road were you traveling on? A. The road from Rose Hill to Dozier.

Q. "And you and he had been discussing the signing of a conveyance to certain lands that he owned, is that right? A. Yes, sir.

Q. "And state whether or not you stated to him or indicated to him that you refused to sign it? A. Yes, sir, I refused to sign it.

Q. "And what then did he say to you about your refusal to sign it? A. Well, he went mumbling something. I didn't understand exactly what it was.

Q. "And did he tell you to dress and come ahead? A. Yes, sir.

Q. "And did you get in the automobile? A. Yes, sir.

Q. "Going to the appointed place? A. Yes, sir.

Q. "And did you as you were traveling in the automobile to the appointed place discuss the question of your signature to the deed? A. Yes sir.

Q. "And that on the road from Rose Hill to Dozier? A. Yes, sir.

Q. "And it was then that he * * * A. That he attempted to drive me in the river if I didn't sign the deed.

Q. "There is a river bridge between where you were at the time and the place you were going, is that right? A. Yes, sir.

Q. "How many months pregnant were you at that time, in your judgment? A. I was about six months.

Q. "Your figure had begun to swell? In other words, it was very evident? A. Yes sir, I was large.

Q. "You were not able to get around as agilely? A. No, I couldn't very well get around.

Q. "Was is (it) your judgment that he would have done it? A. Yes, sir.

Q. "What was your reaction to it, were frightened? A. I was almost frightened to death. I was so scared I couldn't move.

Q. "Did he then proceed on to the appointed place? A. Yes, and out near the end of the bridge he told me not to try to get smart whenever I got there, that he could see me later just as good as he could then."

And on cross examination as follows:

Q. "Now on the occasion that you spoke about him attempting to drive you in the river, just tell us exactly what he said and done on that occasion? A. Well, the morning when he come in, the morning we were going to sell the place, he come in and said get dressed, that Gus Nash has finally made up his mind to by my place, and I was piddling around in the kitchen and I said to him, 'I want you to understand that I am not going to sign the deed, sign anything unless you turn over half of what it brings, half the money, turn it over to me and put it in the bank in my name,' and he railed out why did I want to act like that, and I went to tell him about * * *

Q. "Well now was that after you were pregnant? You were about six months pregnant? A. From May until about the last of October. I went on to tell him about the way that he was doing, about his staying out and going off on week ends and drinking whiskey and beer and him coming to the cleaners and getting his clothes and even taking them out of the house, and having those lice on his body. I said that is the reason I am doing it, and I felt like I was going to have to raise my child myself, and he started some kind of a rage and went in the bathroom mumbling out something and he come out and he didn't exactly humor me, but pacified me up to some extent, and he said 'well, get ready, we'll arrange it as you suggested.' So we had a clear understanding there, and I said to him that I want you to clearly understand this. He said, 'all right, all right.' So we got on the car and started and just before we got to Conecuh River he brought the car to a stop and says 'I haven't got Mr. Nash or any of them there as you asked me to back at the house,' and I said, 'I am not going to sign the deed,' and he said 'you are done it,' and I said, 'I'm not going to do it,' and he said, 'well, if you don't do it I'll drive you over there in the river and you'll be the one that don't come out,' and I was scared to death......

Q. "Now he was stopped at that time? A. At that time he was stopped.

Q. "Go ahead. A. Whenever we got out to the end of the bridge he told me not to try any smart stuff when I got there, he could see me later just as good as he could then.

Q. "Now that was all that was said in that conversation? A. He said a few more words.

Q. "Can you tell us what they were. A. He said straighten yourself up and get yourself together before we get there.

Q. "That was all that was said in that conversation?

Q. "Who was there when you got there to sign the deed? A. The justice of the peace.

Q. "Who was that? A. He introduced me to him, but I don't remember his name now.

Q. "Anyone else? A. No, sir, nobody else.

Q. "And where were you? A. At the justice of the peace's house. He had an office like in his home.

Q. "You signed the deed in the presence of him? A. Yes, sir.

Q. "You didn't make any complaints to the justice of the peace, did you? A. No, made no complaint.

Q. "Did you make any complaints to anybody else? A. No.

Q. "Where did you go from there? A. Went back home.

Q. "Did you make any complaint to anyone after you got back home? A. Well, yes, I did, I said a few words about it. I didn't say much.

Q. "Who did you say it to? A. Mrs. Grimes.

Q. "What did you say to her about it? A. That evening I was in out there and she said, 'Edsel, did you sign it? You told me you wasn't going to,' and I said yes, mam, Mrs. Grimes, I had to."

The deed referred to above was signed on October 25, 1946, and complainant lived and slept with respondent until December 22, 1946, on which later date respondent, at complainant's request, carried her to the home of her father. Complainant testified that for sometime prior to October 25, 1946, the parties had no sex relations.

The deed, above referred to, bore the separate and apart acknowledgment of the wife. Mrs. Grimes denied having a conversation with complainant concerning the signing of the deed. Complainant made no complaint to anyone relative to respondent's mistreatment of her. Several neighbors of the parties testified that they had never seen respondent mistreat complainant in any way; nor had they heard of such mistreatment. Respondent explicitly denied that he had ever, at any time, committed violence on the complainant, and had never made any threats of violence against her.

Our cases are clear to the effect that a divorce on the ground of cruelty is justified only when physical violence endangering life or health has occurred or is reasonably apprehended. Jones v. Jones, 189 Ala. 286, 66 So. 4; Morrison v. Morrison, 165 Ala. 191, 51 So. 743; Murray v. Murray, 238 Ala. 158, 189 So. 877; Bailey v. Bailey, 237 Ala. 525, 187 So. 453; Ray v. Ray, 245 Ala. 591, 18 So.2d 273.

The cause was submitted for final decree on the testimony taken before the register. Under the circumstances no presumption is indulged in favor of the trial court's finding of facts, and we must here sit in judgment on the evidence. This duty we have carefully performed.

Except for the one threat outlined in the above testimony of complainant, and denied in its entirety by respondent, the record fails to disclose conduct on the part of the husband from which danger to complainant's life or health could be reasonably apprehended. This one incident, weighted by the denial of the husband, and the fact that the wife remained in his home, sleeping in the same bed with him for nearly two months without complaining to his or her people, does not meet the requirements of our statute, as construed by our cases. In so holding, we are not unmindful of the testimony of the wife as to other reprehensive conduct of the husband, not amounting to cruelty, but which conduct was also denied by the husband.

We are clear to the conclusion that complainant has failed to meet and carry the burden imposed on her by the allegations of the bill, and is not entitled to a divorce on the ground of cruelty.

Reversed and remanded.

BROWN, SIMPSON and STAKELY, JJ., concur.